**CASE NO. 23-2176(L), 23-2284**

## IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

———————————————

JULIE A. SU,
Acting Secretary of Labor, United States Department of Labor,
*Plaintiff - Appellee,*

v.

MEDICAL STAFFING OF AMERICA, LLC, d/b/a Steadfast Medical
Staffing, a limited liability company; LISA ANN PITTS, individually
and as owner and officer of the aforementioned company,
*Defendants - Appellants.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT NORFOLK

———————————————

**OPENING BRIEF OF APPELLANTS**

———————————————

Abram J. Pafford
Francis J. Aul
MCGUIREWOODS, LLP
Black Lives Matter Plaza
888 16th Street, NW
Washington, DC 20006
202-857-1725
apafford@mcguirewoods.com
faul@mcguirewoods.com

*Counsel for Appellants*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Counsel for Medical Staffing of America, LLC, d/b/a Steadfast Medical Staffing certifies under Fed. R. App. P. 26.1 that it is not a publicly traded company and is not owned by a parent corporation.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ..............................................................................v

INTRODUCTION ............................................................................................1

JURISDICTIONAL STATEMENT ....................................................................2

ISSUES PRESENTED......................................................................................3

STATEMENT OF THE CASE...........................................................................4

    I.    Factual Background.............................................................................4

        A.    Steadfast's Formation and The DOL's Investigation .....................4

        B.    DOL's Lawsuit and the Trial ........................................................5

        C.    Evidence Presented at Trial...........................................................6

        D.    The District Court's Classification Opinion and Backpay Ruling................................................................................................13

SUMMARY OF ARGUMENT ..........................................................................14

STANDARD OF REVIEW ...............................................................................17

ARGUMENT ..................................................................................................18

    I.    The District Court Misallocated the Burden of Proof on the Classification Issue, and in Turn Committed Clear Error on Key Findings of Fact. .................................................................................19

        A.    The district court failed to properly allocate the burden of proof. .......................................................................................20

        B.    The district court's misallocation of the burden of proof contributed to clear error in its findings of fact. ...........................25

1.  The nurses controlled their own schedules and could
    also work with other registries and staffing agencies...............26

2.  The nurses routinely managed a wide range of
    discretionary choices that involved opportunities for
    profit and loss..................................................................28

II.   The District Court's Analysis of the "Control" Factor Conflicts
      with This Court's Worker Classification Precedents. ............................33

      A.   The district court erred by treating features commonly
           present in independent contractor arrangements as default
           proof of employment status.............................................35

      B.   The district court failed properly to evaluate or account
           for Steadfast's lack of operational control over the nurses'
           work.........................................................................38

III.  The Other "Economic Realities" Factors Favor Steadfast. ......................44

      A.   The nurses had opportunities for profit and loss............................44

      B.   The nurses invested in their own equipment and materials...........46

      C.   The relationship was not permanent ..............................48

IV.   Steadfast Proved Its Good Faith Defense against Liquidated
      Damages. ...........................................................................49

      A.   Steadfast had a reasonable basis for its classification
           decision.....................................................................49

      B.   Steadfast made good faith efforts to comply with the
           FLSA. ........................................................................53

V.    The District Court Erred by Adopting A DOL Backpay
      Computation Table Rife with False Entries and Prejudicial Data
      Entry Errors. .............................................................................54

CONCLUSION ........................................................................................59

ORAL ARGUMENT STATEMENT ......................................................59

CERTIFICATE OF COMPLIANCE ......................................................61

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018) ...................................................... 22

*Benshoff v. City of Virginia Beach*,
    180 F.3d 136 (4th Cir. 1999) ........................................... 21

*Bolden v. Callahan*,
    595 F. Supp. 3d 727 (E.D. Ark. 2022) ............................. 48

*Bratt v. Cnty. of Los Angeles*,
    912 F.2d 1066 (9th Cir. 1990) ......................................... 50

*Burnley v. Short*,
    730 F.2d 136 (4th Cir. 1984) ..................................... 50, 53

*Calderon v. GEICO Gen. Ins. Co.*,
    754 F.3d 201 (4th Cir. 2014) ........................................... 57

*Calderon v. GEICO Gen. Ins. Co.*,
    809 F.3d 111 (4th Cir. 2015) ..................................... 49, 50

*Carlson v. Boston Scientific Corp.*,
    856 F.3d 320 (4th Cir. 2017) ........................................... 57

*Chao v. Mid-Atlantic Installation Services, Inc.*,
    16 F. App'x 104 (4th Cir. 2001).............................. *passim*

*Chevron, U.S.A., Inc. v. NRDC*,
    467 U.S. 837 (1984) ......................................................... 34

*Compton v. Alton S.S. Co.*,
    608 F.2d 96 (4th Cir. 1979) ............................................. 59

*Donovan v. Brandel*,
    736 F.2d 1114 (6th Cir. 1984) ......................................... 48

*Hall v. DIRECTV, LLC*,
    846 F.3d 757 (4th Cir. 2017) ........................................... 21

*Herman v. Mid-Atlantic Installation Services, Inc.*,
    164 F. Supp. 2d 667 (D. Md. 2000) ......................... *passim*

*High Country Arts & Craft Guild v. Hartford Fire Ins. Co.*,
  126 F.3d 629 (4th Cir. 1997) ............................................................. 58

*Hylind v. Xerox Corp.*,
  632 F. App'x 114 (4th Cir. 2015) ...................................................... 58

*Kerr v. Marshall Univ. Bd. of Governors*,
  824 F.3d 62 (4th Cir. 2016) ............................................................... 21

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019) ...................................................................... 34

*Krus v. Krus*,
  2021 WL 5275546 (4th Cir. Nov. 12, 2021) ...................................... 57

*Marshall v. Brunner*,
  668 F.2d 748 (3d Cir. 1982) .............................................................. 51

*Mayhew v. Wells*,
  125 F.3d 216 (4th Cir. 1997) ............................................................. 17

*McFeeley v. Jackson St. Ent., LLC*,
  825 F.3d 235 (4th Cir. 2016) ................................................... *passim*

*Murchison v. Astrue*,
  466 F. App'x 225 (4th Cir. 2012) ...................................................... 59

*Nat'l Credit Union Admin. Bd. v. Gray*,
  1 F.3d 262 (4th Cir. 1993) ................................................................. 58

*North Carolina State Conf. of the NAACP v. Raymond*,
  981 F.3d 295 (4th Cir. 2020) ............................................................. 22

*Owen v. Com. Union Fire Ins. Co. of N.Y.*,
  211 F.2d 488 (4th Cir. 1954) ....................................................... 22, 24

*Parrish v. Premier Directional Drilling, L.P.*,
  917 F.3d 369 (5th Cir. 2019) ............................................................. 48

*Richard v. Marriott Corp.*,
  549 F.2d 303 (4th Cir. 1977) ............................................................. 52

*Roy v. Cnty. of Lexington*,
  141 F.3d 533 (4th Cir. 1998) ....................................................... 50, 54

*Schultz v. Cap. Int'l Sec., Inc.*,
    466 F.3d 298 (4th Cir. 2006) .................................................................. *passim*

*Shea v. United States*,
    976 F.3d 1292, 1299 (Fed. Cir. 2020) .............................................. 50

*United States v. Vogue, Inc.*,
    145 F.2d 609 (4th Cir. 1944) ............................................................ 18

*Vaughns* by Vaughns *v. Bd. of Educ. of Prince George's Cnty.*,
    758 F.2d 983 (4th Cir. 1985) ...................................................... 22, 24

*Westberry v. Gislaved Gummi AB*,
    178 F.3d 257 (4th Cir. 1999) ............................................................ 18

## Statutes

28 U.S.C. § 1291 ...................................................................................... 3
28 U.S.C. § 1292 ...................................................................................... 3
28 U.S.C. § 1331 ...................................................................................... 2
29 U.S.C. § 216 ...................................................................................... 49
29 U.S.C. § 217 ........................................................................................ 2
29 U.S.C. § 260 ...................................................................................... 49

## Other

Fed. R. Civ. P. 52 .............................................................................. 56, 58
Fed. R. Civ. P. 54 .............................................................................. 56, 57
Fed. R. Civ. P. 60 .............................................................................. 56, 58
Fed. R. Civ. P. 65 ................................................................................... 2

## **INTRODUCTION**

Medical Staffing of America, LLC d/b/a Steadfast Medical Staffing ("Steadfast") was founded in 2015 by Lisa Pitts, a Navy veteran and single mother of four children who was anxious to achieve more flexibility and higher pay for her work as a Licensed Practical Nurse ("LPN"). The company grew gradually in size through 2019, then rapidly in 2020 and 2021. Steadfast helped dozens of healthcare provider clients identify and engage with a rotating pool of more than 1100 nurses willing to care for vulnerable patients during an unprecedented global health crisis. Nurses from this network testified that they contracted with Steadfast to be a liaison with healthcare providers for reasons echoing Ms. Pitts's original motivation—they prized flexibility, and the opportunity to set their own hours, select their own shifts, and control their own income.

For its efforts, Steadfast was sued by the United States Department of Labor ("DOL"), which demanded Steadfast reclassify its nursing workers as "employees" rather than "independent contractors," and alleged that Steadfast's misclassification had deprived nurses in its network of statutory overtime pay. On January 14, 2022, after several years of contentious litigation, the district court issued a memorandum opinion in which it found that Steadfast had violated the Fair Labor Standards Act ("FLSA") by failing to classify the nurses within its network as employees.

Despite circuitous post-trial and appellate proceedings, the district court's January 2022 decision on FLSA liability remains the focal point of this appeal. The district court made a series of legal errors that contravene the key principles of this Court's FLSA jurisprudence in independent contractor vs. employee classification disputes. Its opinion would likely eliminate independent contracting arrangements in the nursing industry—a dangerous precedent when nurses are in short supply. The district court also erred by rejecting Steadfast's good-faith defense to DOL's liquidated damages claim, because Steadfast consulted multiple times with leading Virginia employment attorney John Bredehoft concerning its operational approach, and Bredehoft advised Steadfast he was "highly confident" its nursing registry reflected a valid independent contracting arrangement under the FLSA.

## JURISDICTIONAL STATEMENT

DOL's lawsuit sought injunctive relief, backpay, and liquidated damages under the FLSA. The district court properly exercised jurisdiction pursuant to 29 U.S.C. § 217 and 28 U.S.C. § 1331. Defendants initially appealed (on March 14, 2022) from the district court's January 14, 2022 opinion and injunction order, which found Steadfast had violated the FLSA, and enjoined Steadfast "from committing further violations of the FLSA." JA1214, JA1216. This Court, in an unpublished opinion, vacated the district court's injunction for failure to comply with the requirements of Fed. R. Civ. P. 65(d).

2

On September 7, 2023, the district court stood by its earlier January 2022 classification analysis, and reimposed a permanent injunction on Steadfast. JA2135. So Steadfast filed a November 3, 2023 notice of appeal, again invoking this Court's interlocutory jurisdiction over injunctions under 28 U.S.C. § 1292(a)(1). On December 7, 2023, the district court issued an opinion on certain unresolved backpay motions, and on December 11 entered final judgment in favor of DOL in the amount of $9,346,663.23. Steadfast again timely appealed, and this Court consolidated both appeals. *See* JA2144, JA2169. This Court has jurisdiction over the consolidated appeals pursuant to 28 U.S.C. §§ 1291 and 1292(a)(1).

## ISSUES PRESENTED

1.  Whether the district court erred in relieving DOL of its burden to prove the nurses were employees under the FLSA.

2.  Whether the district court erred in concluding the nurses were employees rather than independent contractors under the six-factor "economic realities" worker classification test.

3.  Whether the district court erred in holding Steadfast was not entitled to a good faith defense against liquidated damages.

4.  Whether the district court abused its discretion in adopting a DOL backpay computation table containing thousands of false entries in which DOL

repeatedly doubled or arbitrarily increased the "hours worked" figure when compared to the hours shown in Steadfast's payroll records.

## STATEMENT OF THE CASE

### I.    Factual Background

### A.    Steadfast's Formation and the DOL's Investigation

Ms. Pitts is a single mother of four and a Navy veteran who worked for over twenty years as a licensed practical nurse. JA951-954. She worked multiple jobs to make ends meet, with little control over the hours she worked. JA938-940. In 2015, she formed Steadfast as a limited liability company that specialized in connecting certified nursing assistants, licensed nurse practitioners, and registered nurses (collectively, "nurses") with healthcare facilities. JA1865-1866 (Pretrial Stipulation); JA955. Ms. Pitts has maintained a 100% ownership interest in Steadfast, and she is responsible for running its day-to-day operations and overseeing approximately 15 office employees. JA1866, JA571-572, JA653, JA960. Steadfast does not maintain any nurses on staff, and its front office is entirely removed from the actual practice of nursing. JA78-79.

In 2017, a DOL investigator, Alvaro Mazuera, interviewed a nurse on Steadfast's registry who complained to the DOL about Steadfast's pay practices. JA1269-1270, JA1449. Following that interview, Mazuera confronted Ms. Pitts, and questioned her about Steadfast's classification of nurses as independent contractors.

4

JA1247-1250, JA1271.  During that brief conversation, Mazuera suggested that her attorney's classification advice was "wrong" before telling her "[l]ook, I think you misclassified employees as independent contractors." JA1249-1250. Mazuera then spoke with a few other Steadfast employees before returning to his office to run backpay computations in anticipation of "a final conference with the employer," at which he later presented his calculations to Ms. Pitts and her lawyer and said "[t]his is how much money you owe." JA1251, JA1271, JA1299.

Such cursory investigations are apparently standard practice for DOL. Mazuera admitted that, as of his deposition in February 2019, he had conducted "over 140" similar investigations, and *in every case* had decided the workers at issue should be classified as employees. JA1258-1259 ("[H]ave there been any instances where you've been through this and you looked at the payroll records and you determined that the individuals were properly classified as independent contractors? A. Until this day, no. Q. It's never happened? A. Not yet. No."), JA1262 (same).

**B.     DOL's Lawsuit and the Trial**

On May 2, 2018, less than a year after Mazuera first approached Steadfast, DOL filed this action against Steadfast and Ms. Pitts.  JA48. The case proceeded to a bench trial, where the parties called 20 nurses who testified about their working relationship with Steadfast. The court also heard (twice) from both individuals who ran Steadfast's day-to-day operations, Ms. Pitts and Christine Kim, as well as

representatives from other staffing agencies and client facilities, and two DOL analysts. Finally, the court heard testimony regarding Steadfast's good faith efforts to comply with the FLSA from Bredehoft—the highly-qualified attorney who advised Steadfast on the FLSA when DOL filed suit.

On January 14, 2022, the district court issued its post-trial opinion finding that Steadfast was liable under the FLSA for misclassifying the nurses as independent contractors and failing to pay them overtime wages. JA1185. The district court's opinion purported to assess the "economic realities" to determine whether the nurses were employees or independent contractors. That test considers six "non-dispositive" factors that bear on whether workers have been properly classified as independent contractors. *See McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235, 241 (4th Cir. 2016).

## C.    Evidence Presented at Trial

With this backdrop, the evidence at trial showed the following:

***Steadfast's Operations***. Steadfast is a nurse staffing registry that serves as an intermediate matchmaker between freelance nurses and a variety of healthcare and medical facilities. JA574, JA961, JA1000, JA1043-1044, JA1046-1047, JA1187. Its business model is straightforward. Nurses would apply to be added to Steadfast's registry, and Steadfast would screen each applicant, including a background check, license verification, drug screening, and collecting payroll information. JA138-139,

6

JA1045-1046. If a nurse "ha[d] the prerequisites and their credentials [we]re valid, then they [we]re simply added" to the registry. JA654, JA961-963. Steadfast required applicants to complete baseline paperwork, including HIPAA acknowledgments and refreshers on policies concerning substance abuse and harassment, JA226, JA253-254, JA717, JA970-971, JA1064, but it did not provide nurses with any orientation or training in the practice of nursing, JA314, JA694, JA743, JA764, JA873, JA906, JA973.

The client facilities regularly communicated with Steadfast concerning staffing needs, including specifics on the required licensures and shifts to be filled. JA999-1002, JA1046-1047. Nurses would then contact a Steadfast scheduler (via phone and, later, the Zira app), JA700, JA737-738, JA756-758, JA798-799, JA867, JA905, JA999, or be contacted by Steadfast through, for example, email blasts, JA714-715, JA999-1002. Steadfast required nurses to keep timesheets, to be signed by an authorized facility employee. JA163, JA184, JA305, JA327, JA345, JA785, JA718-719, JA744, JA767, JA875. Once Steadfast confirmed the accuracy of the timesheets with a client facility, JA642-643, JA616-617, JA645, JA821, JA859, Steadfast would pay the nurses.

***Flexibility in Choosing Shifts***. Nurses set their own schedules. Nurses would proactively communicate their availability for particular time periods, and then generally could select, accept, and/or decline available shifts. *See e.g.*, JA155-158

(C. Hopson), JA180-181 (S. Boykins), JA241 (D. Wooten), JA262 (J. Jones), JA290-291 (K. Bellamy), JA318-319 (T. Canady), JA336 (C. Turner), JA350 (T. White), JA687-689 (P. Clark), JA704-706 (N. Alston), JA735-737 (T. Hall), JA756-758 (D. Hall), JA865-867 (R. Coates), JA905 (L. Boone), JA999-1000 (L. Pitts). Thus, per the district court, the nurses "do not have a start date or set work schedule," nor are they "require[d] . . . to work a minimum number of hours or prohibit[ed] . . . from exceeding a maximum number of hours," JA1191; *see also, e.g.*, JA692 (P. Clark), JA716 (N. Alston), JA739 (T. Hall), JA759 (D. Hall), JA871 (R. Coates). Nurses need not make any commitment to stay on Steadfast's registry for any length of time. JA398-399 (A. Tirado), JA692 (P. Clark), JA714 (N. Alston), JA722-723 (N. Alston), JA739 (T. Hall), JA761-762 (D. Hall), JA869-870 (R. Coates).

**_Working with Other Registries_**. Of the twenty nurses who testified at trial, 17 were asked if they also took shifts from other registries (either close in time to or parallel to ongoing or intermittent work with Steadfast). Per the table below, 12 of the 17 testified they did, and two more said they could have if they wanted to. Only three said they believed Steadfast frowned on working with other registries/agencies, and two of these three (Teresa Morey and Chantella Smith) *ended* their tenure with Steadfast in 2017 (before DOL's investigation began, and before Steadfast consulted Bredehoft). The third (also testifying about her work in 2017) said she also worked for another agency, but kept this from Ms. Pitts and Steadfast.

8

| 20 Nurses Testified at Trial | | |
|---|---|---|
| **14 testified they could work at other registries** | **3 testified (circa 2017) they were not permitted to work at other registries** | **3 were not asked** |
| R. Adams (JA215) | T. Morey (JA300, JA306) | L. Boone |
| N. Alston (JA710) | C. Smith (JA361, JA366) | T. Canady |
| K. Bellamy (JA292) | Y. Taylor[1] (JA114, JA128, JA132-133) | C. Taylor |
| S. Boykins (JA183) | | |
| P. Clark (JA691) | | |
| R. Coates (JA868-869) | | |
| D. Hall (JA750, JA761-762) | | |
| T. Hall (JA740) | | |
| C. Hopson (JA138) | | |
| J. Jones (JA248) | | |
| A. Meggie (JA276-277) | | |
| T. White (JA346-347) | | |
| D. Wooten (JA240-241) | | |
| A. Tirado (JA398-399) | | |

Steadfast's competitor (First Choice) corroborated this flexibility, testifying through a corporate representative that the two companies "share[d] nursing personnel." JA672, JA1035-1036.[2]

---

[1] This nurse worked for another registry anyway.

[2] The District Court noted that Steadfast's Independent Contractor Agreements contained a non-compete clause, but the testimony at trial established this clause was not enforced by Steadfast. JA138, JA157, JA240-241, JA248, JA292, JA346, JA672, JA693-694, JA712, JA754, JA870-871, JA1034-1036. The district court relied on PX-10, JA1692-1780 (Steadfast's "Independent Contractor Agreements"), without analyzing testimony establishing the economic realities of the actual working relationship.

9

***Rate of Pay***. The pay rate for a shift depended on several factors, including the nurses' licensure, the facility type, and the facility's specific needs. JA315, JA383, JA495-496, JA733, JA760, JA774. Some nurses successfully negotiated their rates of pay. For example, nurses negotiated the pay rate if a particular facility required travel or was difficult to work at. JA874, JA997-998. Other times, particularly when there was an urgent need, nurses negotiated higher rates of pay for particular assignments. JA142-143, JA262-263, JA292, JA298, JA718, JA998. And client facilities were sometimes "willing to negotiate the rate for a nurse just because the nurse is really good at what she does." JA998. In these circumstances, Steadfast would either renegotiate the billing rate with a client facility or "eat" the increased cost. JA997-998. Nurses exercised significant control over their profit by considering the pay rate for facilities when deciding to accept or decline shifts through Steadfast. JA704, JA714-715, JA752-753, JA763-764, JA871-872.

***Autonomy of the Nurses***. Steadfast exercised almost no supervision over the nurses' performance of their duties at client facilities. All the nurses' work was performed at client facilities—not Steadfast's office. JA78-79, JA572-573. Steadfast did not supervise or control the nurses in the performance of their work at a facility, *i.e.*, the manner in which they nurse. JA160-161, JA185, JA292, JA694, JA743, JA764, JA873, JA1010. No Steadfast employee is ever on-site at a facility to monitor

or direct the nurses in performing their duties. JA134, JA160, JA185, JA292, JA328, JA449, JA694, JA743, JA764-765, JA834.

Steadfast did not evaluate nurse performance and has never provided performance reviews or evaluations. JA694, JA743-744, JA873, JA1010. If a client facility concluded a nurse was violating its standards, it placed the nurse on a "Do Not Return" ("DNR") list and notified Steadfast so the nurse would not be able to select future shifts with that facility. JA1015. This happened, for example, in situations when a nurse was intoxicated at work, fighting, neglectful of patients, or otherwise not meeting the facility's expectations. JA1015-1016. Steadfast had no ability to challenge a client facility's DNR designation. JA1016-1017.

***Opportunities for Profit and Loss***. Nurses testifying at trial consistently described a working arrangement in which they confronted many variables when assessing options for a given workday or workweek, all of which carried opportunities for profit and loss depending upon the nurse's managerial skill. Beginning with the choice of whether to seek shifts or not during a particular workweek, decisions encompassed comparisons between shifts available through Steadfast's registry vs. other staffing agencies, possible negotiation of pay rates based on characteristics of specific shifts or facilities, accounting for pros and cons of overnight or long-distance shifts, balancing short-term preferences as to rates or working conditions against opportunities to establish a long-term or recurring

11

relationship with a particular facility, and deciding at appropriate junctures whether to invest time and money in further training or licensing to potentially secure additional or more lucrative shifts. *See, e.g.*, JA138-162 (C. Hopson), JA180-183 (S. Boykins), JA240-241 (D. Wooten), JA336-339 (C. Turner), JA687-702 (P. Clark), JA706-732 (N. Alston), JA750-764 (D. Hall), JA864-872 (R. Coates).

### ***Good Faith Compliance with the FLSA***.

As the sole owner of a fledgling business, Ms. Pitts conducted her own research using search terms such as "staffing agencies," "independent contractors," and "1099s." JA955-957. She also retained attorney Wanda Cooper before she "first decided to start a staffing agency." JA955-957. Pitts' search terms obviously sought information relating to the legal classification of workers associated with staffing agencies. JA955-957.

Then, in June 2018, after DOL filed suit, Steadfast retained Bredehoft to assess whether Steadfast's classification of its nurses was lawful under the controlling "economic realities" test. JA1136. Bredehoft reviewed a considerable amount of evidence including: (1) "a large number of the agreements between Steadfast and the nurses on the registry," (2) "all of the agreements between Steadfast and healthcare providers," and (3) "a large number of invoices and transactional documents." JA1126. In a second meeting in January 2019, Bredehoft spoke with Ms. Pitts and Ms. Kim about (1) the nurses' "level of autonomy," (2) the

12

absence of "negative consequences to any of the nurses for not calling" if they could not fulfill their shift as scheduled, (3) nurses' ability to take personal time by not accepting Steadfast shifts, and (4) the way the nurses were paid. JA1129-1131. Bredehoft then applied DOL's "Fact Sheet 13"—which listed the various factors under the "economic realities" test—to Steadfast. JA1131. He concluded, to "a very high degree of confidence," that the nurses on the registry appeared to be properly classified as independent contractors under the economic realities test. JA1136. He told Steadfast it had an "excellent chance" of prevailing on the issue of classifying the nurses as independent contractors under the FLSA. JA1136. Steadfast relied on this advice in continuing to classify the nurses as independent contractors. JA1039.

### D.    The District Court's Classification Opinion and Backpay Ruling

On January 14, 2022, the district court issued its post-trial opinion finding that Steadfast violated the FLSA by (1) misclassifying its nurses as independent contractors and failing to pay them overtime rates, and (2) relatedly, failing to keep records documenting overtime pay. It also held Steadfast had not established a good faith defense to liquidated damages. JA1185-1215.

The district court held that five of the six factors of the "economic realities" test weighed in favor of classifying the nurses as employees. JA1205-1211. In its view, only one factor—the degree of skill required for the nurses' work—suggested the nurses might be independent contractors. JA1211. The district court also held

13

that Steadfast failed to prove it acted in good faith, and thus was not shielded from potential liquidated damages. JA1211-1214.

Accordingly, the district court enjoined Steadfast from committing further violations of the FLSA, and ordered DOL to produce an "updated calculation of back pay and liquidated damages within sixty (60) days of the date of [the] opinion," while tasking Steadfast with providing DOL "all information necessary" for DOL's updated calculation. JA1214-1215. A disturbing pattern of unexplained and prejudicial errors in DOL's backpay computation table was discovered during this 60-day period, leading Steadfast to move for post-trial relief. Steadfast's March 2022 motion seeking this relief was eventually denied by the district court on December 7, 2023. On December 11, 2023, the district court entered a final judgment against Steadfast in the amount of $9,346,663.23.

## SUMMARY OF ARGUMENT

Steadfast provides a registry service that helps healthcare facilities secure nursing care from a network of more than 1100 nurses who contracted with Steadfast. The district court acknowledged that Steadfast's operational model gave nurses "the opportunity to accept or decline shifts," without a "set work schedule," and without specifying a minimum or maximum number of hours. JA1191. The nurses in Steadfast's network were responsible for maintaining and securing their own licenses and providing their own equipment. Steadfast played virtually no role

in supervising how these nurses performed their medical work, and Steadfast had no operational, managerial, or administrative presence at the dozens of medical facilities where these nurses cumulatively worked hundreds of thousands of shifts during the years at issue. Steadfast's nursing workers routinely faced a wide range of recurring choices—and had to account for factors such as rate of pay, possible negotiability of pay, proximity to client facilities, contemporaneous assignments or shifts available through competing staffing agencies, strategic choices involving pursuit of long-term or recurring roles at specific facilities, pros and cons associated with travel or long-distance assignments, and decisions on investment in further training or licensing to qualify for a wider range of tasks and shifts—all of which exposed the nurses to opportunities for profit and loss based upon their managerial skill. Steadfast reasonably believed this was a lawful independent contracting model.

In rejecting this model, the district court's opinion ignores or contradicts the key principles of this Court's FLSA jurisprudence in independent contractor/employee classification disputes. *First*, the district court appears implicitly to have relieved the DOL of its burden to prove that the nurses were "employees" under the FLSA, an error invited by DOL when its proposed post-trial conclusions of law misallocated the burden of proof on this threshold issue.

*Second*, this misallocation of the burden of proof contributed to clear error on key district court findings of fact that were flatly contradicted by the overwhelming

15

weight of the trial testimony. *Third*, the district court ignored this Court's precedent warning against overbreadth in FLSA classification analysis, and thus erred as a matter of law in basing its findings of alleged Steadfast "control" on factors equally likely to be present in bona fide independent contractor relationships.

*Fourth*, the district court all but ignored the core element of the "control" analysis under this Court's FLSA cases—i.e., the near complete absence of *any* control by Steadfast over the manner in which the nurses in its network provide medical care to thousands of patients across dozens of independently-owned healthcare facilities where Steadfast has no administrative or managerial presence, no supervisory authority, and no operational role.

The district court compounded these errors through its perplexing choice to omit discussion of this Court's precedent when analyzing the issue of control. It instead engaged in arbitrary line-drawing with no connection to the governing six-factor "economic realities" test this Court uses in FLSA classification disputes. This line-drawing essentially parrots DOL's non-binding Field Assistance Bulletin No. 2018-4 ("FAB"), issued two months *after* DOL filed suit against Steadfast.

The district court's errors in its classification analysis were mirrored by its improper rejection of Steadfast's good-faith defense. Leading Virginia employment attorney John Bredehoft held multiple meetings with Steadfast, reviewed a range of key documents, and advised Steadfast unequivocally that it had properly established

a lawful independent contractor relationship with the nurses. Steadfast maintained what it believed was a valid independent contractor structure in reasonable reliance upon this advice.

The district court also abused its discretion by basing its backpay award on a DOL computation table that repeatedly doubled or arbitrarily increased the figure in the "Total Hours" column when compared to the corresponding figure shown on Steadfast's actual payroll records. Multiple rules authorize post-trial correction of such errors to avoid a miscarriage of justice and a judgment founded on false or inaccurate evidence. Steadfast timely sought appropriate relief, and the district court abused its discretion by denying Steadfast's motion.

## STANDARD OF REVIEW

"Whether a worker is an employee or an independent contractor under the FLSA is ultimately a legal question subject to *de novo* review." *McFeeley*, 825 F.3d at 240. This Court reviews "the district court's legal conclusions *de novo* and its factual findings for clear error." *Mayhew v. Wells*, 125 F.3d 216, 218 (4th Cir. 1997) (quotation omitted).

This Court reviews a "district court's award of liquidated damages for abuse of discretion." *McFeely*, 825 F.3d at 245. A district court abuses its discretion when a reviewing court possesses a "definite and firm conviction that . . . a clear error of

judgment" has occurred "upon a weighing of the relevant factors." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (quotation omitted).

## **ARGUMENT**

This Court has long recognized that worker classification issues under the FLSA and similar statutes present companies with difficult line-drawing challenges. *See United States v. Vogue, Inc.*, 145 F.2d 609, 612 (4th Cir. 1944) ("Few problems in the law have given greater variety of application and conflict in results than the cases arising in the borderland between what is clearly an employer-employee relationship and what is clearly one of independent entrepreneurial dealing."). These challenges are especially acute in instances involving large numbers of workers whose status is evaluated across a multi-year period. *See McFeeley*, 825 F.3d at 241 ("While a six-factor test may lack the virtue of providing definitive guidance to those affected, it allows for flexible application to the myriad different working relationships that exist in the national economy.").

In such cases, this Court has articulated two important guiding principles. First, while the FLSA must be interpreted in the light of its remedial purpose, it is not appropriate to use an overbroad analytical framework that sweeps in features typically present in both employment relationships *and* independent contractor relationships, and automatically treat the presence of such features as proving the former and negating the latter. *See, e.g.*, *McFeeley*, 825 F.3d at 243; *Herman v. Mid-*

18

*Atlantic Installation Services, Inc.*, 164 F. Supp. 2d 667, 672–74 (D. Md. 2000), *aff'd sub nom. Chao v. Mid-Atlantic Installation Services, Inc.*, 16 F. App'x 104 (4th Cir. 2001) (rejecting DOL reliance on alleged "control" factors that were "perfectly consistent" with both employee/employer and independent contractor relationships).

Second, in classification disputes when the status of dozens or hundreds of workers is at issue, evidence establishing general policy or typical practice within the relevant working environment must be given greater weight than outlier evidence that might amount to little more than the anecdotal experience of a few workers on a handful of specific occasions. *See McFeeley*, 825 F.3d at 241–42 (cautioning against "cherry-pick[ing]," and emphasizing generally applicable policies of alleged employer when analyzing issue of control); *Herman*, 164 F. Supp. 2d at 673–77, n.4, n.10 (assigning weight to evidence of general policies and typical operational practices, and discounting significance of outlier evidence).

## I. The District Court Misallocated the Burden of Proof on the Classification Issue, and in Turn Committed Clear Error on Key Findings of Fact.

The district court's substantive errors were intertwined, mutually reinforcing, and prejudicial. The failure properly to allocate the burden of proof to DOL led the district court repeatedly to cite anecdotal evidence about discrete instances of alleged "control" by Steadfast, while failing to make evidence-based findings about Steadfast's customary operational practices that prevailed in the aggregate across its relationships with a referral network of more than 1100 nurses. It then ignored what

19

the record established concerning the most important factor under the FLSA's "economic realities" test—"[t]he degree of control a putative employer has *over the way an alleged employee's work is performed*[.]" JA1201-1202 (emphasis added).

The combined force of these errors is reflected in the district court's "control" analysis, when it failed to apply *any* principles from this Court's prior FLSA cases. Instead, the opinion does little more than selectively parrot language from the FAB, thereby allowing DOL's line-drawing to replace this Court's careful line-drawing under the FLSA. *See McFeeley*, 825 F.3d at 241 ("The dueling depictions serve to remind us that the employee/independent contractor distinction is not a bright line but a spectrum, and that courts must struggle with matters of degree rather than issue categorical pronouncements.").

## A.    The district court failed to properly allocate the burden of proof.

Because the FLSA's statutory definitions of "employee" and "employer" "do little to solve problems as to the limits of the employer-employee relationship under the FLSA, the Supreme Court has explained that courts must determine whether, as a matter of economic reality, an individual is an employee or an independent contractor in business for himself." *See Chao*, 16 F. App'x at 105–06. Application of this "economic realities" test turns on six factors:

(1)    The degree of control that the putative employer has over the manner in which the work is performed;

(2)    the worker's opportunities for profit or loss dependent on his managerial skill;

(3)  the worker's investment in equipment or material, or his employment of other workers;

(4)  the degree of skill required for the work;

(5)  the permanence of the working relationship; and

(6)  the degree to which the services rendered are an integral part of the putative employer's business.

*McFeeley*, 825 F.3d at 241. No single factor is dispositive, and all are part of the totality of circumstances. *Id.*

The "threshold liability question" here is whether the nurses within Steadfast's network are employees. *See Herman*, 164 F. Supp. 2d at 671. Independent contractors are "outside of the FLSA's scope." *Hall v. DIRECTV, LLC*, 846 F.3d 757, 764 (4th Cir. 2017). Accordingly, it is DOL that should have borne the burden of proof on the threshold liability question in this case. *See, e.g.*, *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 83 (4th Cir. 2016) ("FLSA conditions liability on the existence of an employer-employee relationship, and the employee bears the burden of alleging and proving the existence of that relationship."); *Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999) ("Those seeking compensation under the Act bear the initial burden of proving that an employer-employee relationship exists and that the activities in question constitute employment for purposes of the Act.").

Nevertheless, the district court failed to acknowledge or allocate DOL's burden of proving its claims against Steadfast. This error was invited by DOL's

21

proposed post-trial conclusions of law, which incorrectly asserted that Steadfast bore

the burden of proving that the nurses were independent contractors. JA1976. When

a district court fails to "apply—or even mention" the burden of proof, it commits

"unmistakable error." *See North Carolina State Conf. of the NAACP v. Raymond*,

981 F.3d 295, 303 (4th Cir. 2020). Moreover, findings of fact based on the incorrect

burden of proof "cannot stand," and must be set aside. *See Abbott v. Perez*, 138 S.

Ct. 2305, 2326 (2018); *see also Vaughns by Vaughns v. Bd. of Educ. of Prince

George's Cnty.*, 758 F.2d 983, 992 (4th Cir. 1985) (district court's fact finding "was

tainted by the failure to recognize" proper burden of proof); *Owen v. Com. Union

Fire Ins. Co. of N.Y.*, 211 F.2d 488, 489 (4th Cir. 1954) ("The rule that an appellate

court will not disturb findings of fact made by the trial judge unless they are clearly

erroneous does not apply" if there is "mistake as to the burden of proof.").

The district court erred by evaluating the classification issue as though

Steadfast, not DOL, bore the burden of proof. On the critical issue of control, the

district court did not cite cases, and instead tracked the DOL's preferred policy

position as articulated in the FAB. The district court listed seven factors discussed

in the FAB (most of which have no clear connection to the governing "economic

reality test"), quoted equivocal language from the FAB on five of the seven, and then

asserted (without balancing competing evidence or making credibility

determinations) that *any* evidence indicating the existence of such practices provided

a basis for deeming the nurses employees rather than independent contractors. This circular approach improperly relieved DOL of its burden to prove the existence of an employer-employee relationship under this Court's precedents applying the six-factor "economic realities" test.

The district court's inversion of the burden of proof is also shown through its contradiction of this Court's classification precedent emphasizing the importance of general or customary practices over isolated anecdotes. For example, in *Schultz*, the security agents were subject to an eight-page "Standard Operating Procedure" that "strictly dictated the manner in which the agents were to carry out their duties." *Schultz v. Cap. Int'l Sec., Inc.*, 466 F.3d 298, 307 (4th Cir. 2006). The employer supplied "almost every piece of equipment the agents used," and the fact that some agents "chose to use their own firearms" did not change the significance of the typical operational practice. *Id.* at 308. In *McFeeley*, the court emphasized "typical" "deposition testimony" with respect to the clubs' control of the dancers' schedules, and the detailed written rules that governed them during working hours, while discounting the employers' arguments that "cherry-pick[ed] a few facts that supposedly tilt in their favor." 825 F.3d at 241–42. Similarly, in *Herman/Chao*, the district court drew distinctions between evidence of typical practice, versus anecdotal or outlier evidence that might cut in a different direction. *See* 164 F. Supp. 2d at 673 n.4 (discussing common practice of route-swapping) & 675 n.7

(discounting DOL's emphasis on MAT's paying for specialty tools, because it was exception to typical practice in which installers bore their own operational costs).

This rule is especially important here, where DOL sought to impose millions of dollars in damages on a small business flowing from hundreds of thousands of shifts worked by more than 1100 nurses at dozens of independent client facilities over nearly seven years. JA568 (Steadfast served 50 facility clients). The district court was required to consider the prevailing operational practices across this seven-year period to determine whether Steadfast exercised sufficient control to bring these workers within the scope of the FLSA. But it never acknowledged the correlation between the sweeping scope of DOL's allegations, and the corresponding strength of the evidence DOL needed to prove them. Instead, the district court's findings repeatedly invoked isolated or anecdotal evidence from witnesses who had limited temporal involvement with Steadfast, while ignoring the weight of contrary evidence cutting in the other direction.

The net effect of the district court's approach was to improperly impose on Steadfast the burden of proving, at each step and stage, that the nurses were independent contractors. This was reversible error, and the district court's flawed factual findings and its corresponding liability holding cannot stand. *See Vaughn*, 758 F.2d at 991–92; *Owen*, 211 F.2d at 489.

24

**B.** **The district court's misallocation of the burden of proof contributed to clear error in its findings of fact.**

Given the breadth of DOL's allegations, covering years of work by more than 1100 nurses at dozens of independently-owned medical facilities, there naturally would be variations as to specific facets of the work experience for individual nurses. This is reflected in the district court's findings, based on testimony from witnesses saying they experienced or heard of certain conduct on discrete occasions – e.g., nurses being pressured to work a particular shift, cautioned or reprimanded for conduct that might jeopardize Steadfast's facility contracts, or removed from Steadfast's registry based upon DNR directives from the facilities. As one would expect, such testimony was limited in scope, and offered little real sense of how common such incidents were across the broad range of working activity implicated by DOL's suit. And unsurprisingly, the record also contains ample testimony of nurses working for multiple agencies/registries at the same time, exercising near-total control over when and where they worked, negotiating for variable compensation in connection with challenging or high-priority shifts, and performing their nursing tasks without operational involvement or oversight by Steadfast. *See supra* at 8–12.

Against this backdrop, the district court's misallocation of the burden of proof contributed to a number of factual findings that are clearly erroneous. At a minimum, the district court committed clear error in "Additional Factual Findings" ("AFF") ¶¶

25

42 and 50, relating to the ability of Steadfast's nurses to also pursue shifts through other registries or staffing agencies, and AFF ¶¶ 11-12, 24, 34, and 43, bearing on the nurses' freedom to make discretionary choices in managing their income-generating nursing activities in ways that created possibilities for both profit and loss.

1.    *The nurses controlled their own schedules and could also work with other registries and staffing agencies.*

The district court recognized that "[b]ecause Steadfast gives nurses the opportunity to accept or decline shifts, the nurses do not have a start date or set work schedule," and "Steadfast does not require the nurses to work a minimum number of hours or prohibit the nurses from exceeding a maximum number of hours." JA1191 (AFF ¶¶ 30-31). Despite these findings, the district court ultimately presented a misleading picture of the nurses' autonomy, in part by implying in AFF ¶ 42 that nurses faced "discipline[]" for "working for a competitor" or "declining or cancelling shifts," JA1193, and in AFF ¶ 50 that "Steadfast decides which nurse is sent to respond to the client-facilities' needs." JA1194.

Any suggestion that Steadfast's nurses faced regular discipline for seeking work or accepting shifts through a competing registry or staffing agency is clear error. As explained, 17 of the 20 nurses who testified at trial were asked about this, and 14 of the 17 testified that there was no policy against seeking and accepting work through other agencies/registries, either parallel to their involvement with

26

Steadfast, or by moving back and forth depending on factors such as which registries/agencies could offer shifts at particular facilities the nurses preferred. Only three nurses said they thought Steadfast frowned on parallel work with other agencies/registries (although one of them did it anyway), *and all three ended their relationship with Steadfast in 2017*, before Steadfast consulted with Bredehoft, and well before the bulk of the working activity (in 2019 through 2021) that accounts for the lion's share of DOL's backpay allegations.

Similarly, any suggestion by the district court that Steadfast regularly sanctioned nurses for "declining" shifts, or that Steadfast unilaterally "decides which nurse is sent" to a client facility for particular shifts, misstates, misunderstands, or simply ignores the testimony of nearly every nurse called as a witness. The trial record established unequivocally that Steadfast's registry typically operated as a free market, "first come, first serve" system, with nurses reviewing a list of available shifts at various facilities, and then affirmatively communicating to Steadfast (through phone, email, and/or the Zira app) the shifts they wished to claim. *See supra* at 7–9. No doubt there were occasions where Steadfast might have played a more active role in meeting a specific need for a particular client facility. But *in general*, Steadfast allowed proactive choice by the nurses as a routine element of the working relationship characterized by flexibility and scheduling autonomy, which the nurses

27

said was one of the most attractive features of their relationship with Steadfast.[3] *See supra* at 7–12.

> 2.    *The nurses routinely managed a wide range of discretionary choices that involved opportunities for profit and loss.*

The district court's failure to hold DOL to its burden of proof is also reflected in its reliance on outlier testimony to ignore the recurring opportunities for Steadfast nurses to gain profit and incur loss based upon their managerial skill. In fact, the trial evidence established in considerable detail that the nurses regularly exercised managerial control over their income-generating activities in ways that created opportunities for profit and loss.

The discretionary choices confronting the nurses began with whether to seek shifts at any given time. According to the trial testimony of the Steadfast nurses, possibilities for profit and loss typically extended well beyond that threshold issue. For an individual nurse such questions might include: "How do the shifts at Steadfast

---

[3] The district court did not cite any nurse testimony to support its finding that Steadfast chose which nurses were sent to a facility. JA1194 (AFF ¶ 50). It relied entirely on the perfunctory testimony of Erica Johnson (JA418, JA421) and David Rawlings (JA479), each representing a Steadfast healthcare facility client. They testified Steadfast did not provide a list of available nurses, so *from the facility's standpoint* it was Steadfast that decided who would arrive to fill a shift. This was presumably true from the limited perspective of both witnesses, but it does not negate the uniform testimony of nearly every nurse witness describing a system in which *an affirmative choice by the nurse to seek shifts in a particular day or week, and then to select or accept specific shifts from a range of available options*, was a core feature of the working relationship between the nurses and Steadfast.

compare to those available through other agencies/registries?" "How much competition will there be for the type of shifts I prefer?" "Can I negotiate higher pay at facilities with difficult working conditions?" "How should I balance distance and commuting expense vs. working conditions vs. rate of pay when selecting shifts?" "Are there tradeoffs to consider vis-à-vis repeat or long-term placements at one facility vs. short-term flexibility and prioritizing highest-rate shifts on a given day?" "Should I invest in further licensing or training in order to qualify for a wider range of potential shifts?" *See supra* at 7–12 (summarizing representative nurse testimony).

These opportunities for profit and loss through managerial choice were described in some detail by the testifying nurses:

- C. Hopson: (multiple registries; higher regular rates at Steadfast vs. potential overtime elsewhere; negotiability of rates for last-minute or in-demand shifts; ratio of compensation to travel distance) JA138-162;

- S. Boykins: (multi-state licensing and geographic considerations; facility preferences vs. availability of shifts; option to apply to additional registries) JA180-183;

- D. Wooten: (alternating shifts between multiple registries; travel options vs. local assignments through Steadfast) JA240-241;

- C. Turner: ("total control" over schedule; frequent option to work more than 40 hours per week; chance to "promote yourself" for opportunities at new facilities) JA336-339;

- P. Clark: (working conditions vs. facility location; full control over schedule; limiting shifts while in school to move from LPN to RN;

options to seek shifts through multiple registries; potential bonuses for meeting urgent need; tradeoff between "home facility/work family" vs facility not being a good fit; home healthcare shifts through non-Steadfast source; investment risk where RN license did not result in materially higher hourly rate; forgoing higher-rate shifts due to travel distance) JA687-702;

- N. Alston: (steady presence at one facility to get preference for available shifts; parallel work through multiple registries to maximize hours and "meet the needs of your lifestyle"; occupational health options through non-Steadfast sources; control over schedule and hours; "very hard" vs. "easier" working conditions at different facilities; potential bonus pay for facilities with urgent need or long travel distance; "It's the freedom to work the way I want to work, how I want to work, take what I want to make, when I want to make it"; sometimes negotiating rate of pay with Steadfast; accounting for rate of pay when choosing facilities and shifts) JA706-732;

- D. Hall: (personal availability, rate of pay, and timing of shifts as key factors; proactive contact by nurse as first step of engaging with Steadfast schedulers; control over shifts and ability to turn down shifts; licensure status as affecting available shifts; travel considerations; building "better rapport" with schedulers over time) JA750-764;

- R. Coates: (mitigating risk through personal liability insurance; flexibility in accepting or declining shifts; parallel work through other registries as means of choosing highest pay, preferred work location, or optimal schedule; tradeoffs vis-à-vis rate of pay, travel distance, and facility conditions; negotiating higher pay when facilities have urgent needs) JA864-872.

The district court, apparently believing the burden of proof was on Steadfast, made a handful of findings that erroneously downplayed the opportunities for profit and loss dependent on managerial skill. These included, for example, AFF ¶ 11 ("The nurses do not have opportunities for profit or loss depending on their managerial skill."), JA1188; AFF ¶ 24 ("Steadfast's relationship with the nurses is

30

permanent in nature, even if a term limit is stated in a nurse's contractor agreement."), JA1190; AFF ¶ 34 ("The nurses on Steadfast's registry can only increase their wages by working more hours."), JA1191; and AFF ¶ 43 ("The nurses do not exercise independent judgment and perform activities typical of nurses in the medical industry including, but not limited to, administering medications, treating wounds, taking notes, and otherwise for patients."), JA1193.

Given the weight and breadth of the nurses' testimony describing recurring choices they faced in managing opportunities for profit and loss, and the flexibility of their working relationship with Steadfast and other agencies/registries, the district court's conclusory findings reflect clear error. This is especially true when considered under DOL's (unacknowledged) burden of proof, and the sweeping scope of DOL's allegations. DOL had to establish "employee" status under the FLSA for more than 1100 nurses, who over a period of seven years, through Steadfast *and* other registries and staffing agencies, worked hundreds of thousands of shifts across dozens of independently-owned, geographically-dispersed medical facilities where Steadfast had no managerial or supervisory presence.

The district court's clear error is underscored by the anemic evidentiary support it invoked as grounds for its findings. AFF ¶ 12 (JA1188), for example, is based entirely on identical one-word "No" answers from two nurses who were asked if they shared in Steadfast's corporate profits, and a one-page "Profit & Loss"

31

summary from Steadfast (the relevance of which the district court did not explain). This evidence comes nowhere close to supporting the district court's generalized finding that "[t]he nurses do not have opportunities for profit and loss depending on their managerial skill." As explained, the trial record was replete with evidence contradicting this unsupported assertion. *See supra* at 29-30 (summarizing key elements of nurses' trial testimony).

For similar reasons, the district court also clearly erred when it found the nurses typically had a "permanent" relationship with Steadfast, JA1190 (AFF ¶ 24), and that they "can only increase their wages by working more hours." JA1191 (AFF ¶ 34). The nurse testimony established the opposite, because it revealed arrangements in which nurses did not work set schedules, shuffled back and forth between and among Steadfast and competing agencies/registries, negotiated rates of pay, and engaged with Steadfast intermittently, based on a variety of circumstances and preferences. *See supra* at 8–12. The record likewise proved the nurses had opportunities for profit and loss traceable to their managerial skill, and implicated variables like potential negotiability of pay, options for long-term or recurring shifts, and balancing time and money spent on advanced training against possible access to a wider range of higher-paying shifts. *See id.*

AFFs ¶¶ 24 and 34 cite nothing to negate this evidence. For AFF ¶ 24 (JA1190), the district court cited only the testimony of two nurses who chose to seek

shifts solely through Steadfast for several years, along with samples of Steadfast's independent contractor agreements. For AFF ¶ 34 (JA1191), the district court cited snippets of testimony from three nurses—two of whom noted the obvious correlation between working more hours and earning more money, and one (Courtney Turner) whose testimony basically contradicts the district court's claim. Indeed, Turner emphasized her "total control" over her schedule, JA336 ("You're in total control of what you do."), her ability to manage relationships and "promote herself" as a means of securing desirable shifts at specific facilities, JA337, her ability to engage directly with facilities when seeking shifts, JA337-338, and the importance of managing her reputation as a reliable worker in order to control perceptions of her "name," JA339 ("If you mess up your name, that's on you. The work is there. If you carry yourself right, work is there.").

Finally, while AFF ¶ 43 (JA1193) says the nurses "do not exercise independent judgment," this finding (a) rests entirely on testimony from nurses who were not actually asked about "independent judgment"; and (b) references only the nature of the nurses' medical work, without purporting to address potential profit and loss.

## II.   The District Court's Analysis of the "Control" Factor Conflicts with This Court's Worker Classification Precedents.

There are a limited number of cases in which this Court has analyzed FLSA classification disputes, and only a few involved groups of workers, rather than a

single individual. *See, e.g.*, *McFeeley*, 825 F.3d at 239 (collective action involving exotic dancers at two clubs over a three-year period); *Schultz*, 466 F.3d at 300–01 (DOL suit involving work by security guards for Saudi prince over period of several years); *Chao*, 16 F. App'x at 105 (DOL suit involving work by cable installers for large metro-area cable television company over period of several years). These cases provide authoritative guidance courts must use when engaging in the admittedly challenging line-drawing required in FLSA classification disputes.

The district court's opinion does not address—much less apply—these principles. Instead, it relied almost entirely on the FAB. As sub-regulatory policy guidance not related to ambiguous industry-specific regulations, the FAB is not entitled to judicial deference under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984); *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). But unsurprisingly, when the DOL is allowed to draw an overbroad line in post-lawsuit policy guidance to bring nursing referral arrangements within its statutory reach, a defendant's independent contracting model may fall short. The district court's embrace of this circular approach was wrong as a matter of law, and that alone requires reversal. When Steadfast's business model is measured instead against the framework established by this Court's cases, it is clear DOL failed to meet its burden of proving that Steadfast's relationship with the nurses in its referral network was that of employer-employee, rather than a lawful independent contracting arrangement.

34

**A.    The district court erred by treating features commonly present in independent contractor arrangements as default proof of employment status.**

"If any sign of control . . . could convert an independent contractor into an employee, there would soon be nothing left of the former category. Workers and managers alike might sorely miss the flexibility and freedom that independent-contractor status confers." *McFeeley*, 825 F.3d at 243. *McFeeley*'s warning reflects the care this Court has taken to avoid deploying the six-factor "economic realities" test in a manner that would make it unduly difficult to maintain viable independent contractor arrangements within a particular industry. As *McFeeley* explained at greater length:

> None of this is to suggest that a worker automatically becomes an employee covered by the FLSA the moment a company exercises any control over him. After all, a company that engages an independent contractor seeks to exert some control, whether expressed orally or in writing, over the performance of the contractor's duties and over his conduct on the company's premises. It is rather hard to imagine a party contracting for needed services with an insouciant "Do whatever you want, wherever you want, and however you please." . . . Such conditions, *along with the terms of performance and compensation*, are part and parcel of bargaining between parties whose independent contractual status is not in dispute.

*Id.* at 242–43 (emphasis added).

That reality led this Court to distinguish between garden-variety investment by businesses in their own infrastructure in a manner that also provided economic opportunities for workers engaged as independent contractors, versus specific

35

investment that had the effect of nullifying contractor independence. *Id.* at 244. Companies using contractors "have most likely invested in the labor and capital necessary to operate the business, taken on overhead costs, and exercised their managerial skill in ways that affect the opportunities for profit of their workers" (including independent contractors, like Steadfast's). *Id.* "Those fundamental components of running a company, however, hardly render anyone with whom the company transacts business an 'employee' under the FLSA." *Id.*

This Court also applied this principle in *Herman/Chao*, holding that the defendant's enforcement of local regulations and technical specifications in relation to cable television installation jobs, and its imposition of financial penalties on installers who failed to comply with the same, did not make these installers "employees" of the defendant. *See Chao*, 16 F. App'x at 106 ("[R]equiring the Installers to meet MAT's and Comcast's installation specifications is entirely consistent with the standard role of a contractor who is hired to perform highly technical duties.").

*Chao* also explained "the Installers are not *solely* in control of their profits or losses, since they cannot unilaterally determine how many Comcast customers they will service on a given day or the rate at which they are paid for each job." *Id.* at 107. Thus, "the Installers are no less in control of their net profits as a result of these variables than typical independent contractors, whose income [also] derives from

36

how much work someone else wants to give them and at what rate they will be paid."
*Id.*

The district court ignored this principle, repeatedly citing as evidence of alleged "employment" features of Steadfast's relationship with the nurses that are equally common in most independent contracting arrangements. For example, despite finding that Steadfast contracted with healthcare facilities to provide referral and payroll services for nurses the facilities needed, the district court suggested that by paying the nurses for their work (in a setting where nurses could choose the shifts they accepted, and thus the rates of pay they deemed acceptable), Steadfast was acting as an employer. JA1208-1210. But as this Court has observed, "terms of performance and compensation" are "part and parcel" of virtually all independent contracting arrangements. *See McFeeley*, 825 F.3d at 243.

Indeed, Steadfast's payment of nurses for services rendered to third-party clients with whom Steadfast had contracts (i.e., the healthcare facilities) is no different than the independent contractor cable installer arrangement affirmed in *Chao*. In *Chao*, Comcast contracted with defendant MAT to act as a brokering service with independent cable installation technicians (just as healthcare facilities contract with Steadfast). *See Chao*, 16 F. App'x at 105. MAT in turn developed a referral network with a sizable number of installation technicians, entering into independent contractor agreements with each (just as Steadfast entered into

37

independent contractor agreements with its network of nurses). *Id.* The independent contractor installers were paid directly by MAT, not by Comcast, at piece rates determined by MAT (just as Steadfast, not the healthcare facilities, paid the nurses here). *See Herman*, 164 F. Supp. 2d at 670.

The district court's preoccupation with payment is a symptom of its perplexing choice to structure its analysis around DOL's FAB factors, rather than this Court's precedents applying the "economic realities" test. As *McFeeley* and *Chao* recognized, this approach begs the question, because in any independent contractor arrangement, one party pays the other for services performed pursuant to the contract. It thus makes little sense to cite the existence of payment, an indispensable element of any contract *and* any employment relationship, as proof that a particular arrangement is one and not the other. *See, e.g.*, *McFeeley*, 825 F.3d at 242–43; *Chao*, 16 F. App'x at 106–07.

**B.    The district court failed properly to evaluate or account for Steadfast's lack of operational control over the nurses' work.**

Although no single economic realities factor is dispositive, this Court's leading cases have highlighted the "degree of control that the putative employer has over the manner in which the work is performed" as the most significant. *See McFeeley*, 825 F.3d at 241; *Schultz*, 466 F.3d at 304–05. The district court took the same approach here, saying it viewed the degree of control a putative employer has over the way an alleged employee's work is performed as "the most important

factor" in the classification determination. JA1187.

Despite purporting to analyze the same "control" factor that shaped the decisions in *McFeeley*, *Schultz*, and *Chao*, the district court's analysis did nothing of the sort. The control factor addresses the putative employer's control over "the *manner in which the work is performed*." *Schultz*, 466 F.3d at 304–05 (emphasis added). A nurse who testified at trial summarized some of the work the nurses performed:

> You have to know how to read a doctor's order, know what medications and what they do for the patients. You have to know some of the critical values of labs. You have to know trachs [tracheotomy tubes] and G-tubes [gastro tubes,] and how to treat dialysis ports and things like that.

JA748-749. Steadfast did not exercise supervisory control over this work.

In *McFeeley*, the "plain manifestations" of control by the defendant clubs over the dancers included establishing set schedules for each dancer, requiring dancers to sign in at the club, imposing rules governing dancer conduct on club premises, mandating the wearing of dance shoes at all times, establishing the fees dancers could charge for private dances, handling lighting and music for the dancers, and controlling the club atmosphere by making all decisions regarding advertising, hours of operation, and the types of food and beverages sold. 825 F.3d at 241–42.

Similarly, in *Schultz*, the defendants micro-managed the security services provided by the guards, in part through a detailed eight-page standard operating procedure ("SOP") guards were required to follow. *Schultz*, 466 F.3d at 307. The

SOP directed agents to make hourly walks of the property, make regular checks of areas or locations where contractors were working, and to escort contractors in and out of the property through a specific set of doors. *Id.* The SOP even specified a precise sequence and roles for opening the doors to the residence whenever the Saudi prince arrived. *Id.*

And in *Chao*, this Court affirmed the district court's nuts-and-bolts analysis that focused on day-to-day operational details of the work performed by the installers. Some control was exercised by MAT by assigning daily routes, requiring periodic progress reports to dispatchers, and enforcing compliance with technical specifications. *See Chao*, 16 F. App'x at 106. But this limited control was overcome by other indicia of independence, including the ability of installers to sequence their work, attend to personal affairs between work orders, hire assistants, and team with other installers on projects. *Id.* The point is that the core "control" analysis in *Chao*, just as in *McFeeley* and *Schultz*, focused on specific operational details of workers' day-to-day responsibilities, and the level of control exercised by the putative employers over the way that work was performed.

The approach dictated by these cases stands in sharp contrast with the district court's approach here. The district court found that because nurses could accept or decline shifts at their discretion, they did not have set start dates or work schedules and were not required to work a minimum number of hours or prohibited from

40

exceeding a weekly maximum. JA1191. Yet the district court ignored these findings in its analysis, and did not acknowledge that this general ability to accept or decline shifts allowed the nurses, on a case-by-case basis, to control where they worked and what rates of pay they would accept.

More importantly, despite finding that Ms. Pitts was responsible for the day-to-day operations of Steadfast, and despite no evidence suggesting that Steadfast's other office employees had supervisory control over the nurses, the district court ignored the legal significance of these facts. The evidence showed that Steadfast's referral network encompassed more than 1100 nurses covering tens of thousands of monthly shifts in dozens of healthcare facilities. *See* JA568, JA1924. Steadfast did not have an employee handbook, and there was no evidence that Steadfast had *any* supervisory, operational, or managerial presence on even a single occasion at a client facility. *See supra* at 6-7, 10-11. Nor was there any evidence that Steadfast established policies, procedures, or mandatory practices governing the wide range of nursing tasks arising in the course of patient care.

In other words, the record and the district court's own findings established that Steadfast exercised virtually no control over the manner in which the nurses' work is performed. This is the exact opposite of the situation that led this Court to find an employment relationship in cases such as *McFeeley* and *Schultz*. Indeed, Steadfast exercised even less control over the manner in which the work is performed

41

than MAT, the cable installation broker in *Chao*.

The district court placed part of its "control" discussion under the subheading "Supervision and Discipline." JA1210. But even the limited instances of "supervision and discipline" were nothing more than front-end training (and in isolated instances, back-end consequences) in relation to issues appropriately addressed in an arms-length independent contractor arrangement—e.g., punctuality, reasonable notice if unable to attend a previously-scheduled shift, HIPAA compliance, refraining from sleeping or drinking on the job, etc. *See infra* at 43. DOL cannot prove its case by citing anecdotal instances of Steadfast enforcing minimal baseline expectations equally prevalent in both employment relationships *and* commercial independent contracting arrangements. *See, e.g., McFeeley*, 825 F.3d at 242–43 (any company that engages an independent contractor exerts some control over contractor performance and conduct); *Chao*, 16 F. App'x at 106 (finding valid independent contractor arrangement where MAT docked pay of installers for noncompliance with regulations or contract technical specifications).

DOL may cite the district court's "Supervision and Discipline" discussion and argue that Steadfast sanctioned nurses for "working for a competitor" or "declining or cancelling shifts." Even if this were true, these issues have little to do with the focus of the economic realities "control" factor – "the manner in which the work is performed." *See Schultz*, 466 F.3d at 304–05. Moreover, this assertion by the district

42

court invokes AFF ¶¶ 41, 42, and 44 (JA1193), but the evidence underlying these findings confirms that DOL did *not* prove Steadfast exercised day-to-day control over how the nurses performed their work. AFF ¶¶ 42 and 44 (JA1193) contain string cites to trial testimony, but almost all of this evidence references baseline contractual obligations that do not involve control by Steadfast over the nurses' medical work. *See, e.g.*, JA82-83, JA87, JA93 (C. Draughn) (contractual confidentiality and buyout provisions, and policy concerning scheduling shifts through Steadfast), JA229-230 (D. Wooten) (buyout provision in Steadfast contract with client facility), JA590 (L. Pitts) (written reminders to nurses about submitting time sheets), JA699 (P. Clark) (policy against scheduling shifts directly with client facility rather than through Steadfast office), JA935-938 (D. DeLutis) (client facility contacted Steadfast during an incident where nurse appeared intoxicated during shift). To the extent AFF ¶ 44 (JA1193) also mentions "written memorandums," there is no need to speculate— memoranda introduced at trial are included in the record, and consist of brief instructions on submitting timesheets, or one-page exhortations such as "BE ON TIME!!!!!!" and "NO SLEEPING IN THE RESIDENT ROOMS!!". JA1842-1843, JA1845-1845, JA1849-1851.

In sum, nurses obtaining shifts through Steadfast performed their medical work almost entirely free of supervision from Steadfast, which had no written manual, employed no medical liaisons, conducted no training on medical topics, did

43

not use site visits to check on nurses, and had no managerial or supervisory presence at client medical facilities. Making contractors aware of opportunities for work, negotiating the terms of payment, and then paying for the work once complete, is not the same as exercising "control over the manner in which the work is performed." The district court fundamentally erred in failing to draw this distinction, which was a direct result of failing to follow this Court's controlling precedent on the economic realities test. Thus, its "control" finding cannot stand.

## III.   The Other "Economic Realities" Factors Favor Steadfast.

The district court condensed its discussion of the other five "economic realities" into two paragraphs. JA1210-1211. There is no disagreement that the nurses were integral to Steadfast's nursing registry business. Nor should there be disagreement with the district court's conclusion that "[t]he degree of skill (via education and licensures) required for the nurses' work suggests that the nurses could work in an independent capacity[.]" JA1211. The trial evidence on the remaining three factors offers strong support, under this Court's precedent, for Steadfast's classification of the nurses as independent contractors.

### A.   The nurses had opportunities for profit and loss.

The trial evidence established beyond any reasonable dispute that the nurses had a wide range of opportunities for profit and loss that were dependent on their managerial skill in relation to their income-generating activities. This evidence, and

the district court's clear error in reaching a contrary conclusion, has been discussed at length above. *See supra* at 28–33.

The recurring choices facing the nurses, each involving potential benefit and risk, differ substantially from the more restrictive parameters of a traditional employer-employee relationship. This would be true even if Steadfast operated as a closed loop, but it did not, because the nurses testified that potential opportunities with other registries and staffing agencies, including bloc travel assignments, would regularly be weighed against the flexibility and benefits associated with periodic or recurring work through Steadfast. *See, e.g.*, JA691-692 (P. Clark) (typical practice of seeking work from multiple registries could give way to consistent work with Steadfast depending on range of available shifts and facilities,  JA710-711, JA725-726 (N. Alston) (discussing benefit of relationships with multiple agencies, "hustler spirit," and options for using occupational health credentials to obtain occupational therapy assignments not available through Steadfast), JA240-241 (D. Wooten) (describing rotating balance between out-of-state travel shifts through other agencies vis-à-vis shifts from Steadfast when home in Virginia).

In *Chao*, this Court recognized that although cable installers were "not *solely* in control of their profits or losses" because they could not control customer demand, they could "control their own profits and losses by agreeing to work more or fewer hours." 16 F. App'x at 106–07. The installers could also "improv[e] their technique"

to better serve customers and use "business acumen" to make the "required capital investments in tools, equipment, and a truck." *Id.* So too here. Profit and loss for the nurses was dependent on their managerial skill in balancing tradeoffs and accounting for variables (type of work, duration of assignment, location, hourly rate, etc.) across the shifting spectrum of opportunities available through Steadfast and competing registries and staffing agencies. *See supra* at 28–33. Some nurses also improved their skills to the point that a facility specifically requested that nurse for particular shifts, JA998, and nurses could always pursue additional licenses and training to qualify for more (or more lucrative) assignments. The nurses themselves emphasized the importance of negotiating these variables in a manner that allowed them to maximize their opportunities by optimizing their business reputations. *See, e.g.*, JA339 (C. Turner) ("You are not out of work, unless you mess up your name. You only have one name in this outfit."), JA757-758 (D. Hall) (discussing value of "building a relationship" and "better rapport" with Steadfast scheduling personnel).

## B.    The nurses invested in their own equipment and material.

This factor supports independent contractor status for the nurses. The district court correctly found that the nurses paid for obtaining and maintaining their own licenses, and Steadfast neither reimbursed such expenses nor provided nurses with equipment. JA1189-1190. Some nurses used their own equipment, and when nurses obtained equipment from another source, it was from the healthcare facilities, not

Steadfast. JA1196. The nurses' financial investment in their own business activities, and Steadfast's corresponding lack of financial contribution, sets this case apart from *McFeeley* and *Schultz*, where the defendants paid for almost everything. *See McFeeley*, 825 F.3d at 243; *Schultz*, 466 F.3d at 308. Indeed, when one accounts for the cost of initial and continuing education, licensure, and equipment, the financial investment of the nurses in establishing and maintaining their ability to provide nursing services may equal or exceed the "truck plus tools plus uniforms" investment this Court found indicative of independent contractor status in *Chao*. *See Chao*, 16 F. App'x at 107.

Finally, per *McFeeley*, the "profit and loss" and "worker investment" factors focus on "the worker's contribution to managerial decision-making and investment relative to the company's." *See McFeeley*, 825 F.3d at 244 (emphasis in original). Here, the nurses paid for their own equipment, training, and licensing, exercised proactive control over their own schedules, used managerial skill in evaluating recurring choices and tradeoffs associated with opportunities from Steadfast and other registries and staffing agencies, and performed their medical work without supervision or oversight from Steadfast. Steadfast's main operational role was simply to facilitate access to opportunities at its client facilities, which required little more than phone lines and a corporate email account. Thus, "[i]n this case, the ratio

47

of managerial skill and operational support tilts" heavily in favor of "an independent-contractor classification for the [nurses]." *See id.*

## C.   The relationship was not permanent.

Although nurses could accept or reject shifts as they pleased, the district court nevertheless said their relationship with Steadfast was "permanent in nature" and indicated employee status. JA1210. But open-ended relationships that could experience ebb and flow without formal termination or periodic renewal are not permanent. "Permanent" and "indeterminate" are not the same.

In *Chao*, this Court found this factor was neutral, because the installers could "establish a long-term relationship" with the employer though it was not required. *Chao*, 16 F. App'x at 107. And many other courts have sensibly concluded that flexible, intermittent, or open-ended working arrangements do not implicate the type of "permanence" being evaluated under the economic realities test. *See, e.g.*, *Bolden v. Callahan*, 595 F. Supp. 3d 727, 739 (E.D. Ark. 2022) (no permanent relationship in "transient business" where cosmetologists "move[d] frequently from salon to salon"); *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 387 (5th Cir. 2019) ("project-by-project" employment even for many months at a time did not indicate permanence); *Donovan v. Brandel*, 736 F.2d 1114, 1117 (6th Cir. 1984) (farm laborers returning each harvest reflected "mutually satisfactory arrangement, [not] permanent relationship"). In short, the transient nature of contract nursing does

48

not involve a permanent relationship. This factor is either neutral, or favors Steadfast.

## IV.   Steadfast Proved Its Good Faith Defense against Liquidated Damages.

Even if the nurses were employees under the FLSA, Steadfast proved its entitlement to a good faith defense against a potentially devastating liquidated damages award.

The FLSA provides for liquidated damages for willful violations of the act. 29 U.S.C. § 216(b). However, liquidated damages are not appropriate if "the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. The good faith defense exists to protect employers "who violate the statute but who had reasonable grounds for thinking the law was other than it turned out to be." *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 132 (4th Cir. 2015). "Good faith" and "reasonable grounds" are both measured objectively, and establishing either prong is sufficient to satisfy the FLSA's good faith defense. *See id.*

### A.   Steadfast had a reasonable basis for its classification decision.

The district court's first error was distorting the "reasonable basis" prong of the good faith analysis. Properly understood, the defense is satisfied when an employer "innocently believed that the FLSA did not cover [its] employees,"

49

*Burnley v. Short*, 730 F.2d 136, 140 (4th Cir. 1984), or "given the closeness of the issue," made a "reasonable" decision to classify employees a certain way, *Calderon*, 809 F.3d at 132–33. Reliance on the advice of counsel is sufficient even "even though the advice ultimately proved incorrect." *Roy v. Cnty. of Lexington*, 141 F.3d 533, 548 (4th Cir. 1998).

That standard was easily met here. Steadfast's reasonable—indeed, compelling—grounds for believing it was in compliance are illustrated by the classification arguments outlined above, because it was a similar analysis based on this Court's precedents that shaped Bredehoft's advice to Steadfast. Steadfast's good faith efforts are reflected in Lisa Pitts' own research in 2018, her decision to retain counsel (twice), and Steadfast's engagement with Bredehoft through multiple meetings after giving him substantial data relating to Steadfast's business practices and operational approach. *See supra* 12–13. The fact that this case required a 7-day trial to assess liability also supports Steadfast's claim to have acted in good faith. *See, e.g.*, *Calderon*, 809 F.3d at 132–33 (good faith where given "closeness of the issue" defendant made "reasonable" classification decision); *Shea v. United States*, 976 F.3d 1292, 1299–1300 (Fed. Cir. 2020) (good faith proven where trial court required two days of testimony and defendant's classification error "was far from clear"); *Bratt v. Cnty. of Los Angeles*, 912 F.2d 1066, 1072 (9th Cir. 1990)

(regulatory ambiguity and employer's reasonable interpretation foreclosed liquidated damages).

The district court's contrary conclusion rests on several clear errors. *First*, the district court held that Steadfast erred in relying on Bredehoft because DOL "informed [Steadfast] in 2018 that their pay practices violated the FLSA." JA1212. The district court cited *Marshall v. Brunner*, 668 F.2d 748 (3d Cir. 1982), but there, the defendant engaged in a litany of willful misconduct, threatening employees, defying instructions of counsel, and attempting to subvert DOL's FLSA enforcement process. *Id.* at 754. Such conduct is nothing like Steadfast's approach here. It is legal error to hold that mere disagreement with DOL (always present in contested backpay disputes) automatically precludes a good faith defense, especially where an objectively reasonable opinion from highly-qualified counsel affirmed the lawfulness of a defendant's approach.

*Second*, the district court clearly erred in holding that Bredehoft lacked sufficient information to render an objectively reasonable opinion. JA1212-1213. It faulted Bredehoft for failing to interview "nurses, client-facilities, or anyone other than Ms. Pitts and the Payroll Manager, Ms. Kim (who was convicted for felonious embezzlement), regarding [Steadfast's] actual business practices." JA1212. The district court apparently believed Bredehoft was obligated to conduct a mini-trial, in addition to interviewing the people responsible for running business operations and

reviewing a plethora of company records. But the district court contradicts itself—it credits the opinion of a non-attorney DOL investigator formed after a few minutes of interviews as legally binding, while rejecting as unreasonable the opinion of a leading employment attorney based on a substantial review of Steadfast's business practices. Between the two, Bredehoft (a Harvard Law graduate and former chair of the Virginia Bar's Labor and Employment section) was far better positioned to render an objectively reasonable opinion.[4]

*Third*, the district court wrongly discounted Bredehoft's well-supported classification analysis because he did not specifically address the non-binding, equivocal policy guidance in the FAB. JA1212. Steadfast's first meeting with Bredehoft was in June 2018, and DOL did not issue its FAB until July. And even in 2019, an alleged lack of focus on the FAB did not render Bredehoft's opinion unreasonable—especially where the FAB purported to rely on prior case law and DOL publications, with which Bredehoft was already familiar given his decades-long experience in employment law.[5]

---

[4] *See* https://www.kaufcan.com/attorneys/john-m-bredehoft/.

[5] It bears emphasis that the FAB is a nonbinding "guidance" document that focuses mainly on home healthcare, and emphasizes "the totality of the circumstances" rather than "any single factor." *Contra* the district court, the FAB is not remotely comparable to the DOL opinion letter, highlighting a clear statutory command from a prior FLSA amendment, that was deemed pertinent to the good faith inquiry in *Richard v. Marriott Corp.*, 549 F.2d 303 (4th Cir. 1977).

**B.     Steadfast made good faith efforts to comply with the FLSA.**

The district court also erred by rejecting Steadfast's proof of its good faith.

*First*, the district court wrongly said Steadfast could not have acted in good faith "prior to seeking legal counsel in June 2018." JA1211. But this Court has not held that engaging an attorney is a mandatory element of the good faith defense. *See Burnley*, 730 F.2d at 140 (crediting an employer's reliance on the "Virginia Motel Association's newsletters to keep informed of FLSA coverage"). Ms. Pitts's own research, and her pre-2018 retention of attorney Cooper, clearly evince a good faith effort to comply with the law.

*Second*, the district court criticized Steadfast for not providing Bredehoft with "memoranda it issued to nurses"—i.e., a handful of one-page bulletins reminding nurses to complete timesheets, JA1839-1847, identify themselves appropriately, JA1848, be prompt, JA1849, JA1851, and not nap in resident rooms, JA1850. But Steadfast (and Bredehoft) had no grounds for believing memos on baseline contractual expectations transformed the nurses from contractors to employees. Similarly, the district court claimed Steadfast did not adequately disclose its alleged "discipline" practices to Bredehoft. JA1213. This assertion rests on the court's earlier findings suggesting Steadfast regularly disciplined nurses for turning down shifts or seeking opportunities with other staffing agencies, but those findings (as discussed above) involve clear error by the district court.

53

***Third***, the district court claimed Steadfast "did not adhere to Mr. Bredehoft's advice to forgo the non-compete clauses in its contractor agreements," which Bredehoft noted would change his overall classification advice "*if the non-compete is enforced*[.]" JA1204 (emphasis added). But Ms. Pitts testified the non-compete was *not* enforced, JA1035-1036, and the overwhelming weight of evidence at trial confirmed that the non-compete was almost never enforced against Steadfast's network of over 1100 nurses. *See supra* at 9–10 & n.2. DOL also did not introduce any evidence to prove that the non-compete was enforced *after* Bredehoft began advising Steadfast in June 2018.

In sum, the district court used an improper 20-20 hindsight framework, effectively requiring Steadfast, during its discussions with Bredehoft in 2018 and 2019, to predict and account for the full range of factual and legal information the district court would later deem important in January 2022. That is not how the good faith inquiry works, because the defense is implicated only *after* an initial classification assessment, while reasonable and in good faith, is "ultimately proved incorrect." *See Roy*, 141 F.3d at 548.

## V.    The District Court Erred by Adopting A DOL Backpay Computation Table Rife with False Entries and Prejudicial Data Entry Errors.

At trial, DOL presented a backpay computation table entered into evidence as PX-21. JA511-513, JA534-536. PX-21 contained more than 10,000 row entries, each representing a single workweek for a specific nurse. JA2172-2781. DOL's

witnesses testified that the data in PX-21 was drawn from Steadfast's payroll records, invoices, and worker timesheets. JA511, JA529-530. DOL's lead backpay witness also testified that he created PX-21 by manually inputting data from Steadfast's payroll records. JA516-517.

The district court's January 14, 2022 memorandum opinion did not specify a final dollar figure for a backpay award or liquidated damages, instead instructing the parties to exchange information so DOL could update its computations within 60 days. JA1214-1215. The district court's opinion, however, highlighted testimony from a DOL trial witness, who said that when Steadfast's records showed a nurse's weekly hours *exceeding* 168, DOL instead used an "average" of 112 hours as the maximum weekly total when computing backpay. JA1199.

Working more than 168 hours in a 168-hour week is obviously impossible. Because DOL's computations were purportedly based on Steadfast's underlying records, Steadfast (with the aid of newly-retained appellate counsel) took a harder look at the thousands of entries in DOL's PX-21. This review revealed DOL's improper inclusion of dozens of Steadfast's W-2 office employees (who were always paid overtime) in DOL's backpay computation, and a disturbing pattern of data entry errors in which the hours shown in Steadfast's payroll records were doubled or otherwise arbitrarily increased in the corresponding "Total Hours" column of DOL's

PX-21. JA1985-2005. The math did not add up. This pattern of unexplained errors implicates millions of dollars in potential exposure for Steadfast. JA1985-2005.

Steadfast attempted to resolve these issues cooperatively, via a letter sent on March 6, 2022, but DOL declined. On March 11, 2022, *without mentioning to the district court any of the issues identified in Steadfast's March 6 letter*, DOL submitted an updated computation asking for 100% of the alleged backpay computed in PX-21, plus an additional $917,950 in alleged backpay for the period from June 20, 2021 through January 28, 2022. JA1859. DOL's additional computations for this latter time period contained the same type of inflated "Total Hours" errors as those that infected PX-21. JA2118, JA2123-2127.

DOL's actions forced Steadfast to file a March 13, 2022 motion seeking relief under Federal Rules of Civil Procedure 52(b), 54(b), and 60(a)-(b). JA1985-2005. The district court did not rule on this motion until December 8, 2024, when it denied Steadfast relief, reasoning that Steadfast's trial counsel should have identified and challenged the "Total Hours" errors in PX-21 at trial. JA2155.

If it proves necessary for this Court to address damages, Steadfast seeks the same relief here it sought below—an order directing DOL to acknowledge, correct, and explain the improper inclusion of W-2 employees and the myriad inflated "Total Hours" entries in PX-21. JA2078. In denying this relief, the district court abused its discretion under rules designed for post-trial relief in this situation. Rule 54(b)

permits broad flexibility to revise interlocutory orders prior to final judgment, including to prevent a "clear error causing manifest injustice." *See Carlson v. Boston Scientific Corp.*, 856 F.3d 320, 325–26 (4th Cir. 2017). Steadfast timely sought relief on the PX-21 issues in March 2022, at which point the district court had not entered a final judgment on the backpay and liquidated damages amount. This January 2022 ruling on the merits of FLSA classification and injunctive relief was clearly interlocutory as to damages, because it contained no operative language imposing a money judgment against Steadfast, did not identify a final backpay figure, and instead ordered the parties to cooperate before DOL submitted a 247-page supplemental calculation on March 11. *See, e.g.*, *Krus v. Krus*, 2021 WL 5275546, at *1 (4th Cir. Nov. 12, 2021) (order not final where unresolved damage issues remain); *Calderon v. GEICO Gen. Ins. Co.*, 754 F.3d 201, 204–07 (4th Cir. 2014) (same).

Thus, *contra* the district court, Rule 54(b) was an available avenue of relief for Steadfast. And on the merits, Steadfast identified clear (and thus far undisputed) errors infecting DOL's backpay computation tables. The manifest injustice resulting from these errors is equally clear, especially given the district court's order on liquidated damages—*DOL (and the district court) are knowingly forcing Steadfast to pay twice for thousands of labor hours that were not even worked once*.

57

Steadfast is also entitled to relief under Rules 52(b) and 60(a)-(b). No money judgment had been entered against Steadfast as of its March 2022 motion, meaning it was timely under Rule 52(b). *See High Country Arts & Craft Guild v. Hartford Fire Ins. Co.*, 126 F.3d 629, 635 (4th Cir. 1997). DOL's actions in discovery were, at best, inadvertently misleading, because Investigator Mazuera, who supposedly prepared PX-21, never revealed in deposition testimony his repeated doubling or increasing of hours shown on Steadfast's payroll records when entering figures in the "Total Hours" column on PX-21, or his apparent interpretation of Steadfast's records as sometimes showing nurses working more than 168 hours in a single week (a red flag that would likely have spurred greater pretrial scrutiny of PX-21). JA2066-2068. Against this backdrop, the district court abused its discretion by denying Steadfast's March 2022 motion seeking correction of DOL's undisputed errors.

It was also an abuse of discretion, and a manifest injustice, to deny relief under Rule 60. *See, e.g.*, *Hylind v. Xerox Corp.*, 632 F. App'x 114, 116 (4th Cir. 2015) (60(a) as tool for correcting mathematical errors); *Nat'l Credit Union Admin. Bd. v. Gray*, 1 F.3d 262, 266 (4th Cir. 1993) (60(b) as "grand reservoir of equitable power to do justice in a particular case"). Extraordinary circumstances are present here. Steadfast faces potential backpay and liquidated damage obligations that appear inflated by millions of dollars, via thousands of phantom hours not shown in

Steadfast's payroll records, but inexplicably included in the backpay tables created and sponsored by DOL. This Court has granted relief under Rule 60 in similar cases. *See Murchison v. Astrue*, 466 F. App'x 225, 229 (4th Cir. 2012); *Compton v. Alton S.S. Co.*, 608 F.2d 96, 100 (4th Cir. 1979).

## **CONCLUSION**

For the reasons explained, the judgment of the district court should be reversed.

## **ORAL ARGUMENT STATEMENT**

This case involved litigation spanning four years and a trial with more than two dozen witnesses, resulting in a fairly voluminous trial court record. Nursing services are obviously of vital importance to public health, and if the district court's decision stands, it is hard to see how any meaningful independent contracting arrangement in the nursing industry can survive. Extensive trial court testimony suggests that the flexibility associated with Steadfast's business model is of paramount importance to many nurses. Permanently stripping nurses of this flexibility, in the wake of a global pandemic that has already placed substantial pressure on the supply of qualified nurses, carries significant risks. Given the importance of these issues, Steadfast respectfully requests that this Court schedule oral argument on Steadfast's appeal.

Dated: February 1, 2024

Respectfully submitted,

*/s/ Abram J. Pafford*

Abram J. Pafford
Francis J. Aul
MCGUIREWOODS LLP
888 16th Street N.W.
Suite 500
Washington, D.C. 20006
T: (202) 857-1725
F: (202) 828-3350
apafford@mcguirewoods.com
faul@mcguirewoods.com

*Counsel for Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because:

- This brief contains 13,648 words, including 650 additional words allowed by leave of the Court, and excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because:

- This brief has been prepared in a proportionally spaced 14-point Times New Roman font using Microsoft Word.

*/s/ Abram J. Pafford*
Abram J. Pafford